COURT OF APPEALS

                                                 SECOND DISTRICT
OF TEXAS

                                                                FORT
WORTH

 

 

                                               NOS.  2-08-394-CR

       
  2-08-395-CR

 

GARY SMITH                                                                                     APPELLANT

 

                                                             V.

 

THE STATE OF TEXAS                                                                             STATE

 

                                                       ------------

 

               FROM
THE 158TH DISTRICT COURT OF DENTON COUNTY

 

                                                       ------------

 

                                                      OPINION

 

                                                       ------------

Appellant
Gary Smith appeals from his convictions and sentences in two trial court cause
numbers involving multiple sexual offenses against his daughters Christine and
Rhonda.[1]  Appellant brings thirteen points challenging
(1) the trial court=s alleged failure in each
case to require the State to make proper elections and to instruct the jury of
the State=s Aostensible@
elections (points one through six); (2) the trial court=s
denial of appellant=s written motion for
continuance (point ten); (3) the trial court=s
admitting evidence of an extraneous assault on Christine and her half-sister in
Lubbock (point eleven); (4) the trial court=s
exclusion of testimony from a CPS investigator (point twelve); (5) the trial
court=s
limiting cross-examination of Rhonda (point thirteen); (6) and the
permissibility of imposing life sentences in four of the convictions for sexual
assault of Christine under the ex post facto protections of the State and
federal constitutions (point nine), or the legal and factual sufficiency of the
evidence to support the jury=s
fact findings supporting the elevation of the punishment range for those
offenses from second degree to first degree felonies (points seven and
eight).  We affirm in part and reverse
and remand in part.

                                        I.  Procedural Background[2]

In
cause number 2-08-394-CR, the case involving Christine, the jury convicted
appellant of one count of indecency with a child and seven counts of sexual
assault of a child.  Four of the sexual
assault counts were alleged to be first degree felonies under penal code
section 22.011(f), which provides that the punishment for sexual assault of a
child is enhanced from a second degree to a first degree felony if Athe
victim was a person whom the actor was prohibited from marrying or purporting
to marry or with whom the actor was prohibited from living under the appearance
of being married under Section 25.01.@  Tex. Penal Code Ann. '
22.011(f) (Vernon Supp. 2009).  In
accordance with the jury=s assessment of punishment,
the trial court sentenced appellant to twenty years=
confinement for the indecency conviction, twenty years=
confinement each for three of the sexual assault offenses, and confinement for
life for each of the four sexual assault offenses that were charged as first
degree felonies.  The trial court ordered
that all of these sentences be served consecutively.

In
cause number 2-09-395-CR, the case involving Rhonda, the jury found appellant
guilty of two counts of aggravated sexual assault of a child and two counts of
sexual assault of a child.  In accordance
with the jury=s
assessment, the trial court sentenced appellant to twenty years=
confinement on the sexual assault offenses and confinement for life for the
aggravated sexual assault offenses.  The
trial court also ordered that these sentences be served consecutively,
beginning after the sentences imposed in cause number 2-09-394-CR had been
completed.

               II.  Trial Court=s
Failure to Inform Jury of State=s
Elections

In
his first six points, appellant contends generally that the trial court erred
by failing to inform the jury of the State=s
election of the specific offenses it would rely on for each of the twelve
counts set forth in the indictments.  The
State concedes charge error in both cause numbers,[3]
but it disputes that appellant was harmed.[4]
Accordingly, we will review whether appellant was harmed by the failure to
include an instruction incorporating the State=s
elections and limiting the jury=s
consideration of extraneous sexual offenses to the purpose of determining the
relationship between appellant and his daughters or the state of mind of any of
them.  See Tex.
Code Crim. Proc. Ann. art. 38.37, ' 2
(Vernon Supp. 2009); Dixon v. State, 201 S.W.3d
731, 734 (Tex. Crim. App. 2006); Rivera v. State, 233 S.W.3d 403, 406 (Tex. App.CWaco
2007, pet. ref=d).

A.  Standard of Review

We
must first determine under what standard to assess harm.  Appellant contends that because the jury was
not adequately informed of the State=s
elections, this case is tantamount to a case in which no election was made at
all and, thus, that we should use the constitutional harm standard applied in Phillips
v. State, 193 S.W.3d 904, 913B14
(Tex. 2006); see Duffey v. State, No.
05-08-00260-CR, 2009 WL 2596109, at *3 (Tex. App.CDallas
Aug. 25, 2009, no pet.).  The State
contends that we should use the Almanza
egregious harm standard instead because this case involves charge error and
appellant did not go far enough in preserving his complaint in the trial
court:  although appellant objected to
the part of the charge indicating that the State is not bound by specific
dates, and complained to the trial court, AHow
is the jury informed of their election?@ in the context of discussing the charge, the State claims
that appellant should have gone further and requested a specific limiting
instruction from the trial court.  But Almanza requires only a timely objection or
request to preserve charge error.  Almanza
v. State, 686 S.W.2d 157, 171 (Tex. Crim. App.
1984) (op. on reh=g).  Appellant objected in the trial court on the
basis that the State=s election was not
adequately communicated to the jury in the charge, and the trial court
overruled the objection; thus, appellant preserved his complaint about this
error.  See Tex. R. App. P. 33.1(a)(1); Almanza, 686 S.W.2d at 171.

Error
in the charge, if timely objected to in the trial court, requires reversal if
the error was Acalculated
to injure the rights of [the] defendant,@
which means no more than that there must be some harm to the accused
from the error.  Tex.
Code Crim. Proc. Ann. art. 36.19 (Vernon 2006); Abdnor
v. State, 871 S.W.2d 726, 731B32
(Tex. Crim. App. 1994); Almanza, 686 S.W.2d at 171; see also Barrios v. State, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009) (AA
claim of jury-charge error is reviewed using the procedure set out in Almanza.@); Pope
v. State, Nos. 02-08-00235-CR, 02-08-00236-CR, 02-08-00237-CR, 2009 WL
3416459, at *12 (Tex. App.CFort
Worth Oct. 22, 2009, pet. ref=d) (mem. op., not designated for publication) (applying Asome
harm@
standard to trial court=s failure to inform jury of
election in charge).  In other words, a
properly preserved error will require reversal as long as the error is not
harmless.  Almanza,
686 S.W.2d at 171.  In making this determination, Athe
actual degree of harm must be assayed in light of the entire jury charge, the
state of the evidence, including the contested issues and weight of probative
evidence, the argument of counsel and any other relevant information revealed
by the record of the trial as a whole.@  Id.; see also Ovalle
v. State, 13 S.W.3d 774, 786 (Tex. Crim. App.
2000).

B.  The Indictment

In
the case involving Christine, the indictment alleged that appellant touched her
breast on or about January 15, 2005 when she was under the age of
seventeen.  The State alleged in Count II
that appellant intentionally or knowingly caused Christine=s
mouth to contact his sexual organ on or about March 15, 2005, and in Count III,
the State alleged that on or about May 15, 2005, appellant intentionally or
knowingly caused Christine=s
sexual organ to contact his mouth; the State alleged that both of these counts
occurred before Christine turned seventeen. 
In Counts IV through VIII, the State alleged that appellant
intentionally or knowingly caused his sexual organ to contact Christine=s
sexual organ when she was under seventeen years old on or about the following
dates:  July 15, 2005 (Count IV),
September 15, 2005 (Count V), November 15, 2005 (Count VI), January 15, 2006
(Count VII), and March 15, 2006 (Count VIII).[5]  The State further alleged in Counts V through
VIII the additional fact that Christine is a person whom appellant is
prohibited from marrying, which fact, if proven, would raise the punishment
range for the offense from a second degree to a first degree felony.  See Tex. Penal Code Ann. '
22.011(f).

In
the case involving Rhonda, the indictment alleged that appellant penetrated her
vaginally on or about July 15, 2003 and on or about January 15, 2004Cwhen
she was under fourteenCand that he penetrated her
vaginally on or about July 15, 2005 and on or about September 2, 2006Cwhen
she was fourteen or older but younger than seventeen.

C.
Voir Dire

During
voir dire, one of the prosecutors discussed the State=s
burden of proof regarding the dates of the offenses alleged in the indictments:

One of the elements we have to prove is the
date when offenses occur.  That=s a little bit
misleading.  What the indictments - - the
way the indictments read is on or about a certain date.  That=s
misleading.

 

What the law says is that for these kinds of
cases, that creates a ten-year window that starts with the day the case was
filed with the courts and then  - - so
basically the date of the indictment, and then goes back ten years, and if we
can show that it occurred within that window, we=re
fine.  We have satisfied the Aon or about@ language.

 

And so if the indictment says something like
on or about July 7th or something, and you go, well, we didn=t hear
any evidence about July 7th, that=s okay as long as we=re
within that window granted by the law. . . .

 

Additionally,
in the State=s
opening statement, after discussing abuse that occurred when the family lived
in Brownfield, Texas, before they moved to Denton County, one of the
prosecutors told the jury:

They eventually moved to Flower Mound, Texas,
which are the cases that he=s charged with today. . . . 

 

. . . .

 

As you heard, there are eight counts with [Christine].  There could be a thousand.  She is going to tell you that it happened
over and over and over, and so many times she can=t even tell you the dates.

 

Now, we talked in voir
dire a little bit about why we have Aon or about@ language, and it=s usually because
kids can=t remember two or
three separate events.  You know, they
don=t know exactly when
it happened.  What I anticipate in this
trial, it=s going to be exactly
the opposite.  Because it happened so
many times, she can=t tell you what dates it happened.  She can tell you signposts. She will tell you
that it happened the summer when I was a freshman in high school, when I was a
sophomore, before my birthday, after my birthday.  But she=s not going to tell you it happened December
15, 2005, because it happened so many times it=s just a blur in her
mind.  [Emphasis added.]

 

Thus, although the State informed the jury
that the evidence would reveal voluminous instances of a continuing course of
sexual conduct, neither in voir dire nor in its
opening statement did the State inform the jury that it would have to choose
only a few out of these thousand occurrences on which to actually convict.

D.  Evidence at Trial

1. 
Christine Smith=s
Testimony

Christine,
who was twenty years old at the time of trial, testified that she is appellant=s
daughter.  Christine first testified
about abuse that occurred in Brownfield, Texas occurring before she turned
fourteen.[6]

a.  Brownfield,
Texas

In
Brownfield, Christine lived with appellant, her father; Heather, her mother;
her younger brother William; and her younger sister Rhonda.  When Christine was around ten or eleven,
appellant started paying more attention to her and commenting about her
physical appearance, especially the development of her breasts.  He told her she was a Areally
pretty girl.@  One time Heather went out of town, and
appellant said Christine could stay in their bedroom; when Christine rolled
over in the bed to go to sleep, appellant Arolled
[her] over and he was holding on to [her] and he grabbed - - he grabbed [her]
hand and he told [her] that it was okay.@  He then made her touch his penis.  Later, while they were still living in
Brownfield, he would make her have oral sex, vaginal sex, and anal sex with
him.  This happened A[a]
lot, several times,@ when everyone was asleep or
when appellant kept Christine home from school. Christine testified that
appellant told her what they did together was Awhat
normal little girls did@ and that she was not
different from anybody.

b.  Flower
Mound, Texas

The
family moved from Brownfield to a three-bedroom apartment in Flower Mound,
Texas around June 17, 2002, several days before Christine=s
fourteenth birthday.  The prosecutor
questioned Christine about the summer the family moved to Flower Mound:

Q.
That summer that you moved here, just turned 14 years old, were -- I guess, how
long before -- or after you moved here did your dad start doing things with you
again?

 

A.
I think it was shortly after we moved.

 

Q.
Was it still in that summer?

 

A.
Yeah.

 

Q.
Tell me about the first time that you remember it
happening when you guys moved to the apartment.

 

A.
Whenever we moved, we got -- my sister and I got new mattresses and we had
bought a lot of new furniture.  And I
believe it was a couple nights after we had moved in and he told me that he had
wanted to break in -- he wanted to break in my new mattress.

 

Q.
What did he mean?

 

A.
That he wanted to have sex on my new mattress.

 

Q.
Did that happen?

 

A.
Yes.

 

Q.
Again, when we talk about sex, what -- again, what body parts touching where?

 

A.
He stuck his penis in my vagina.

 

Q.
When that happened, the breaking in the mattress, where was everybody else?

 

A.
I don=t remember.

 

Q.
Starting from that summer, how long did you guys live in that apartment in
Flower Mound?

 

A.
Flower Mound, for about three years, I think. 
We moved -- we moved right before my senior year.

 

Q.
So that would be starting from the summer of 2002 going forward to -- you said
right before your senior year so that would be the summer of 2005?

 

A. Yes.

The
indecency with a child offense was alleged in the indictment to have occurred
on or about January 15, 2005, and two of the sexual assaults were alleged to
have occurred on or about March 15 and May 15, 2005; all of these alleged dates
fall during the time the family lived in Flower Mound.








Christine
testified that during the three years the family lived in Flower Mound,
appellant kept a close eye on her; she was not allowed to do anything other
than go to school, but she did participate in band.  According to Christine, appellant treated her
like his girlfriend.  He held her hand in
public, took her out on Adates,@
gave her things that he did not give his other children, and was not as hard on
her as the other two.  She and her father
called each other APookie@ and
wrote each other love notes.

Christine
testified that when the family lived in Flower Mound, she and appellant did
something Aphysical,@ A[s]ometimes every other day, sometimes every day.@  Appellant would occasionally stop, but only
for Aa
week or two or so.@  According to Christine, during the three
years the family lived in Flower Mound, appellant penetrated her vaginally more
than fifty times,[7]
penetrated her anally more than fifty times, made her give him oral sex, and
performed oral sex on her.  Christine
also said that during these three years, appellant would touch her breasts with
his hands whenever they had sex.

Christine
was afraid to tell anyone what was happening because appellant told her he
would make her regret doing so, and at least once he told her that he would
kill her.  She testified to a time that
she fought with appellant because she wanted to move out of the house; he
physically assaulted her and threatened her.

c.  Argyle,
Texas

The
family moved from Flower Mound to Argyle[8]
shortly after the end of Christine=s
junior year of high school, in May 2005. 
Five of the sexual assault counts are alleged in the indictment to have
occurred during this time, around July 15, September 15, and November 15, 2005,
and around January 15 and March 15, 2006.

Christine
testified generally that all of the same types of sexual contact with appellant
continued to occur in Argyle.  She
testified to only one specific incident: 
one day, appellant made Christine give him oral sex in his bedroom.  He made a videotape of the encounter, telling
Christine he wanted to have something to watch when she was not there.

Christine
also testified that when she was working at Albertson=s,
appellant confronted her store manager Patrick one day and told him Christine
would not be coming to work that day. 
According to Christine, appellant did not like Patrick because he
thought Christine was dating him, but she was not.[9]

d.  In
General

Toward
the end of the State=s initial direct of
Christine, the prosecutor specifically asked her the following:

Q.
Now, before you turned 17, so when you were 14, 15 and 16 years of age, did
your dad have his sexual organ, his penis, contact your sexual organ, your
vagina?

 

A.
Yes.

 

Q.
And did that happen more than five times?

 

A.
Yes.

 

Q.
Lots and lots of times?

 

A.
Yes.

 

Q.
Before you turned 17 -- 14, 15, 16 years old - - did your dad have his sexual
organ contact your mouth?

 

A.
Yes.

 

Q.
Multiple, multiple times?

 

A.
Yes.

 

Q.
And before you turned 17, did your mouth contact his sexual organ?

 

A.
Yes.

 

Q.
Did his mouth contact your sexual organ?

 

A.
Yes.

 

Q.
Did his hand contact your breasts?

 

A. Yes.

Christine
also testified at length about when she left home for good; she called one of
her half-sisters[10]
who lived in Lubbock and asked her to come to Argyle and pick her up.  Christine told her mother but she did not
tell appellant; she left him a note. 
When appellant found out Christine had left, he followed her and her
half-sister to Lubbock.  He called each
of them during the trip, telling Christine to come home and telling her
half-sister to give Christine back.  He
threatened them, and when he got to Lubbock, he chased them in their car,
eventually ramming their car with his vehicle. 
Christine and her half-sister called the police, but they eventually
signed affidavits of nonprosecution.

2. 
William Smith=s
Testimony

Christine=s
brother William testified that Christine and appellant had a closer
relationship than appellant did with him or Rhonda.  For instance, Christine and appellant spent
more time together.  Appellant paid a lot
of attention to Christine but not to William and Rhonda.  Appellant went everywhere Christine
went.  William testified that Christine=s
and appellant=s
relationship was not a regular father/daughter relationship; instead, it was
more like a Aboyfriend/girlfriend
kind of relationship . . . [b]ecause that=s
the way that they acted.@  Appellant was always very attached to
Christine Ain
an emotional way.@

According
to William, appellant and Christine Awould
go on dates together,@ eat out, and go to the
movies; they were Aattached to each other=s
hip.@  William and Rhonda wanted to be included in
those types of activities, but appellant would put them off.  According to William, AThere
were times where I would come up the stairs and she would be at the doorway and
. . . pretty much expose herself to him. 
And then I would show up and then she would cover herself up.@  William said this would happen when Christine
came out of the shower and appellant went into her bedroom; either she would
open up her bathrobe or appellant would be doing it.  William said appellant knew that William knew
these things were happening.

William
said appellant said inappropriate things about Christine to him outside their
mother=s
presence, such as A>Doesn=t
your sister have a nice ass,= or,
you know, >Doesn=t
she have big boobs,= and stuff like that.=@  It made William feel disgusted.[11]

After
Christine left home for Lubbock, appellant became emotional and angry; A[h]e
would listen to sad songs, [and] he=d
lock himself in his bathroom and drink.@  He listened to one song in particular, AThe
Best I Ever Had.@  William thought the song had to do with
Christine.  More than once after
Christine left for Lubbock, appellant told William that he and Christine had
been lovers; he said they were going to run away together and have a baby.  Appellant told William that he and Christine
had had sex A[p]retty much all over.@  But what appellant said about Christine
depended on his mood; sometimes he would call her a slut, and he told William
it was the boys against the girls, and the girls would try to accuse the boys
of things they had not done.  After
Christine left, Heather confronted appellant and asked him why he had Araped@
Christine; appellant responded that they had been lovers.

According
to William, after Christine left for Lubbock, appellant told him, AYou
remember the time when me and [Christine] would go in there in her room and
watch movies, you know, things were happening under the covers.@  Appellant told William that Christine Awould
do anything to him if he asked.@  Appellant told William he preferred Christine
over Heather because Christine showed him more attention.

William
recounted witnessing an event when the family lived in Flower Mound.  He had been hiding behind Heather and
appellant=s
bed to scare his dad, and he saw Christine and appellant.  Christine wanted to get a dog, and appellant
asked, AWhat are
you going to do for me,@ and started to push
Christine down toward his Aprivate
areas.@  Christine did not say anything; they did not
know William was there.

On
cross-examination, William explained that appellant told him that he and
Christine had had sex in appellant=s
bed, Christine=s
bed, Rhonda=s
bed, William=s
bed, and the family=s couches in their
residences.  When asked if he meant the
houses in both Flower Mound and Argyle, he said, AYes.@

3. 
Rhonda Smith=s
Testimony

Rhonda
testified that she was eighteen at the time of trial.[12]  She was thirteen when the family moved to
Flower Mound.  While they lived in Flower
Mound, when Rhonda was in seventh grade, appellant had vaginal intercourse with
her in her own bed.  He did this at least
twice when she was thirteen at the apartment in Flower Mound.  At least twice after she had turned fourteen
but before she had turned seventeen, he had vaginal intercourse with her at the
apartment in Flower Mound.  Other than
those times, the same thing happened in Flower Mound a Alot
more than four.@  Rhonda explained that the same thing also
happened in her bedroom after the family moved to Argyle.

Rhonda
admitted that when a police officer and CPS interviewed her after Christine
reported what had happened to her, she denied that
appellant had done anything to her. 
Rhonda said she did not tell about these events when she was first
interviewed at the Child Advocacy Center because she was scared of appellant.  She and appellant did not really talk about
these incidents except that he told her he would kill her if she told anybody.

According
to Rhonda, appellant treated her and Christine differently.  AHe
would do everything for [Christine]. 
[Christine] was like his favorite, and he wouldn=t
really treat me like I was his daughter. 
He would treat me like I was some pet or something.@  He would buy Rhonda things only sometimes; A[i]t was mainly [Christine] that he got everything for.@  She could not really tell the nature of
appellant=s
and Christine=s
relationship, though, because she Adidn=t
really see anything.@

4.  Heather Smith=s
Testimony

Heather
Smith, appellant=s wife and Christine,
Rhonda, and William=s mother, testified
generally about appellant=s relationship with
Christine:  how he favored her over
William and Rhonda, how he noticed and commented on her developing physical
appearance, and how he would kiss Christine and hold her in his lap in an inappropriate
way.  She also corroborated William=s
testimony that after Christine left for Lubbock, appellant was Avery
angry@ at
Christine because she had left.  Heather
kept asking appellant for a long time afterward why Christine had left and why
he was so angry; he finally told her that he and Christine Awere
in a relationship@ and were Alovers.@  When she reminded appellant that Christine
was his daughter, he said that she did not act like one and that they were
going to be together.  When William
wanted to know why Christine had left, Heather had him stand by a window while
she asked appellant why he had had sex with Christine.  William heard appellant say how Christine was
Agood@ and
Abetter
than@
Heather.

E.  State=s
Election

Before
resting its case against appellantCoutside
the jury=s
presenceCthe
State elected the dates of the offenses upon which it would pursue conviction.  The following exchange occurred with regard
to the offenses involving Christine:

MR. PAUL [for the State]:  In this instance, the victim, [Christine]
indicated that it happened literally hundreds and perhaps up to a thousand
times.  She indicated that it happened in
the apartment when they moved there, the Denton -- Flower Mound apartment --
Denton County Flower Mound apartment, that it happened
in the Argyle house.

 

I asked her specifically on Count I if the
defendant had touched her breasts when she was younger than 17 years of age in
or around 2005.  She indicated, yes, that
it happened at least once, if not more times. 
The time where she indicated that it did happen, we would elect on that
to be the allegation in that count.

 

I asked her if the defendant caused her mouth
to contact his sexual organ when she was under the age of 17 and if that
happened in the time frame that we talked about, 2003 to 2006, she indicated
yes, on multiple occasions.  That would
satisfy, and we would elect on Count II and on Count III. That would be our
election on II and III. . . .

 

. . . .

 

Count II is her mouth contacting the sexual
organ of the defendant in 2005 when she was under 17.  She indicated yes.  So we would elect one of those occasions that
she=s testified about.

 

Count III, we=re
talking about May of >05, caused the sexual
organ of [Christine] to contact the mouth of the defendant.  I asked her if that had occurred.  She indicated, yes, he had performed oral sex
on her and that that happened in that time frame and before she turned 17.  I asked her specifically in regards to all
these allegations if it happened before her 17th birthday, and she indicated
yes.  So we would elect on one of those
occasions for Count III.

 

Count IV, the allegation is that knowingly
caused the sexual organ of [Christine] to contact the defendant=s sexual organ,
whether he penetrated her with his penis. 
She indicated, yes, that that happened on multiple, multiple
occasions.  And I asked her if it
happened before the age of 17, while she was still 16 or younger.  She indicated yes.  We would elect for one of those to satisfy
that count.

 

MR. BORAH [for
appellant]: That would be prior to her 16th birthday in 2005?

 

MR. PAUL: Correct.

 

MR. BORAH: I believe her birthday is 1989; is
that correct?  Eighty-eight.

 

MR. PAUL: Her birthday is in >88.

 

MR. BORAH: So it would have been prior to her
birthday in 2004?  You=re saying prior to her 16th birthday.

 

MR. PAUL: Certainly prior to her 17th
birthday.  I mean, my questions directed
to her was did this happen prior to you turning 17, so you were 16, 15 or 14,
and she indicated yes.

 

MR. BORAH: So then that would be 2005 or
earlier?

 

MR. PAUL: Yes.  Count V, allegation is causing the sexual
organ of [Christine] to contact the sexual organ of the defendant.  Again, we=re talking about penetration of
the vagina with the defendant=s penis
prior to the age of 17.  She
indicated, again, that that happened on multiple occasions.  We would elect one of those to satisfy Count
V.

 

Count VI, again, is an allegation of
contacting the sexual organ of [Christine] to contact the sexual organ of the
defendant, the same allegation as before. 
She indicated that that had happened on multiple, multiple occasions
younger than the age of 17.  We would
elect one of those.

 

Count VII, cause the sexual organ of
[Christine] to contact the sexual organ of the defendant, same thing as before
in Count VI, prior to the age of 17.  We
would elect, again, one of those to satisfy that count.

 

Count VIII, sexual organ of [Christine]
contacting sexual organ of defendant prior to the age of 17.  She testified that that happened multiple,
multiple times, again, satisfying Count VIII.

 

Those would be our elections in regards to
both indictments, Judge.  [Emphasis
added.]

 

As
for the allegations involving Rhonda, the State elected as follows:

She said that in between the dates of the
summer of 2003 and then up to 2006, she had been sexually penetrated by her
father, [appellant], on four separate occasions, two of which she was under the
age of 14, two of which she was under the age of 17, that she had been
penetrated by his sexual organ and her sexual organ.  I asked her specifically if there were four
separate occasions.  She indicated
yes.  So we will be electing to go
forward on those four in regards to that cause.

 

.
. . .

 

She
indicated that it happened in Argyle, but our election is going to be that
the four occurred while she lived in the Flower Mound apartment.  [Emphasis added.]

We
agree with the State that these elections are adequate.  The elections were general because the complainants=
testimony regarding the offenses was general; however, the State did limit the
time frame to those events occurring before Christine turned seventeen and when
Rhonda was under fourteen and between fourteen and sixteen, to which both girls
had testified.  Both of their birthdates
were in evidence.  And the State further
limited its elections regarding the offenses against Rhonda specifically to
when the family was living in Flower Mound. 
Thus, we overrule appellant=s
first and fourth issues claiming that the trial court erred by refusing to
require the State to make an adequate election.

F.  The Jury Charges

The
jury charge in each case tracked the allegations verbatim from the indictment,
along with the Aon or about@
dates.  Also included in each charge are
the following paragraphs:

You are further charged as the law in this
case that the state is not required to prove the exact date alleged in the
indictment but may prove the offense if any to have been committed at any time
prior to the 11th day of October, 2007, the presentment date of the indictment,
so long as said offense if any, occurred within ten years of the date of the
presentment of the indictment; you are further instructed that the day the
indictment was presented and the day of the offense, if any, occurred, shall
not be computed within the ten year limitation period.

 

You are instructed that if there is any
testimony before you in this case regarding the defendant=s having committed
offenses other than the offense alleged against him in the indictment in this
case, you cannot consider said testimony for any other purpose unless you find
and believe beyond a reasonable doubt that the defendant committed such other
offenses, if any were committed, and even then you may only consider the same
in determining the intent of the defendant, if any, in connection with the
offense, if any, alleged against him in the indictment or in determining the
credibility of any witness, including the defendant, in this case, and for no
other purpose.

 

G.  Closing Argument

During
the State=s
initial closing argument, the prosecutor stated as follows:

One, the date. I hope you=ll recall that we
talked about that in voir dire.  We are not required to prove a specific
date.  In a case like this, there is no
way you could ever do that, okay?  And
the law that we talked about, what seems like a year ago, back on I guess it
was Monday, about that ten-year window, that=s in here and the judge just read that to you
in each case, okay?  All we have to do is
prove that the crimes occurred within that ten-year window and we have
satisfied the on or about.

 

In fact, if you look at [Christine=s] case, you will
actually see, if you go back and you do the math, some of the dates and some of
the counts are actually after [Christine] was 17.  That doesn=t matter, okay?  What matters is --

 

MR. BORAH: Objection. That=s
a wrong statement of the law, Your Honor.

 

MR. CALVERT: That=s a precisely correct
statement of the law.

 

THE COURT: Denied. Overruled.

 

MR. BORAH: It=s also an argument
contrary to the jury charge.  The charge
says that they have to prove that she was a child younger than 17 years of age
then and there on the date that they have alleged.

 

THE COURT: Overruled.

 

MR. CALVERT: Once again, the law does not
require us to prove specific dates.  So
what matters is the evidence that was presented to you through testimony
throughout the course of this trial.  And
it was very clear through [Christine] and it was very clear through [Rhonda]
that the crimes we=re
talking about with [Christine] all happened in Denton County prior to her 17th
birthday.  With [Rhonda], some of them
happened prior to her 14th birthday, some of them happened -- the rest of them
happened prior to her 17th birthday. 
So if you go back there and, you know, you=re doing the math, that=s okay.  That ten-year window, that=s
why that=s there.

 

Also, one of the last things that Tony did
was he introduced a statute, the law, okay? 
It=s the
Texas bigamy statute, 25.01 of the Penal Code.  The reason that=s in is on [Christine=s] case, there are
several counts, I think there is four of them, the way it=s worded is you
commit a sexual assault and the victim is someone who the actor, the defendant,
was prohibited from being married to or holding themself
out as married to.

 

We talked in voir
dire about how there=s lots of different
kinds of sexual assault, lots of different ways to commit sexual assault.  That=s
one of them.  That=s what he=s been charged
with.  If you=re married to one
person and you commit a sexual assault against someone other than your wife --
if you=re married to this
person, by law, you can=t be married to this
person -- that=s a specific type of
sexual assault.  That=s what he=s been charged with
on four of those counts.  That=s why that=s
in there.  I wanted y=all to understand
that.  [Emphasis added.]

 

H.  Analysis

As
the court of criminal appeals has explained,

[R]equiring the
State to elect at the close of its evidence forces it to formally differentiate
the specific evidence upon which it will rely as proof of the charged offense
from evidence of other offenses or misconduct it offers only in an evidentiary
capacity.  This allows the trial judge to
distinguish the evidence which the State is relying on to prove the particular
act charged in the indictment from the evidence that the State has introduced
for other relevant purposes.  Thus, the
trial court can instruct the jury on the proper use and weight to accord each
type of evidence.  Moreover, the election
requirement protects fundamental rights such as notice and unanimity, insuring
both that the defendant is aware of precisely which act he must defend himself
against, and that the jurors know precisely which act they must all agree he is
guilty of in order to convict him.

 

Phillips,
193 S.W.3d at 910 (footnote ommitted).  Judge Cochran has acknowledged the difficulty
of applying the election requirements to cases such as these that involve a
continuing course of sexual abuse.  See
Dixon, 201 S.W.3d at 736B37
(Cochran, J., concurring).

To
determine whether an appellant has been harmed with regard to the failure to
elect, the court of criminal appeals has considered how the error impacted the
case with respect to four main purposes underlying the election rule:  (1) the appellant=s
need to be protected from the admission of extraneous offenses; (2) the risk
that the jury found the appellant guilty of the charged offenses not because
they were proven beyond a reasonable doubt but because of the admission of the
extraneous offenses; (3) the risk of a nonunanimous
verdict; and (4) whether the admission of the extraneous offenses deprived
appellant of adequate notice regarding which offense to defend against.  Dixon, 201 S.W.3d at 734B36; Phillips,
193 S.W.3d at 913B14.  Accordingly, we will consider these factors
in analyzing whether appellant was harmed by the trial court=s
failure to instruct the jury of the State=s
elections in our harm analysis.

1.  Offenses Against
Christine Other Than Count II

Christine
testified that when the family lived in Flower Mound, appellant touched her
breasts whenever they had sex; she also testified to multiple acts of vaginal
penetration occurring when she was under seventeen.  She said that appellant performed oral sex on
her when they lived in Flower Mound, but she did not specify how many
times.  Other than her recollection that
appellant penetrated her vaginally after suggesting they try out her new
mattress, all of Christine=s
testimony regarding the vaginal penetrationsCas
well as the breast touchingCwas
nonspecific and indistinguishable from the rest of the offenses.  See Duffey,
2009 WL 2596109, at *6.

As
for these offensesCthe breast touching,
appellant-on-Christine oral sex, and the vaginal penetrationsCthere
is no concern about the admission of extraneous sexual acts; they were
admissible under article 38.37, section 2 of the code of criminal procedure to
show the relationship between appellant and Christine as well as the state of
mind of either of them.  See Tex. Code Crim. Proc. Ann. art. 38.37, ' 2; Dixon, 201 S.W.3d at 734B35; Rivera,
233 S.W.3d at 406.

As
for the second concern, there is little, if any, risk that the jury convicted
appellant solely because of the extraneous offensesCif
it believed that Christine=s
testimony regarding a continuing course of conduct involving nonspecific,
indistinguishable offenses was credible as to one, the jury must have likewise
believed her testimony was credible as to all. 
See Dixon, 201 S.W.3d at 735; Duffey, 2009 WL 2596109, at *5.  Moreover, Christine=s
testimony was corroborated generally by her brother=s
and mother=s
testimony about what appellant said, and appellant=s
counsel attacked the credibility of all the family members as a collective
unit, on the theory that they were engaged in a conspiracy against appellant.

Additionally,
there is little risk that the jury failed to return a unanimous verdict as to
these offenses.  Unanimity in this
context means that each and every juror agreed that appellant committed the
same, single, specific criminal act to convict him of each of the charged
offenses.  Ngo v.
State, 175 S.W.3d 738, 745 (Tex. Crim. App.
2005).  The final sentence of the
charge reads:  AIt
is the Presiding Juror=s duty to preside at your
deliberations, vote with you, and when you have unanimously agreed upon a
verdict, to certify to your verdict by using the appropriate form, and signing
the same as Presiding Juror.@  Although the charge did not inform the jury
that they had to unanimously agree on specific acts in order to convict on each
count, it did notify the jury that its verdict had to be unanimous.

As
in Dixon, the only distinguishing detail about all of these offenses
appears to be where each of them occurredCin
Christine=s
bedroom or appellant=s.  201 S.W.3d
at 735.  We perceive no risk of
the jury believing only Christine=s
testimony about vaginal penetrations occurring in one of those rooms as opposed
to the other; Heather testified that she was frequently out of the home at work
while appellant stayed home with the children, and although there was testimony
that Christine and Rhonda shared a room, there is no evidence about what time
of day these events occurred or who was around.

As
for the timing of each of these offenses, which were alleged to have occurred
when Christine was under the age of seventeen, Christine told the jury at the
beginning of her testimony that her birthdate is June
20, 1988.  She later testified that she
moved to Argyle at the end of May 2005. 
The prosecutor asked her, ASo
were you sixteen when you guys lived in Argyle?@  She answered, AYeah,
yes.  I turned 17 shortly after.@  So the testimony shows that Christine was
sixteen for around three weeks while the family lived in Argyle.

However,
in closing argument, the prosecutor told the jury that the charged offenses
were limited only to offenses occurring when Christine was under
seventeen.  So there is little, if any,
risk that some of the jury voted to convict for acts occurring in Argyle after
Christine turned seventeen, while others voted to convict for acts occurring in
Flower Mound or Argyle while Christine had not yet turned seventeen.

Finally,
we do not believe that appellant was deprived of adequate notice of which
offenses to defend against.  As we have
explained, in a case such as this, which involves complainant testimony of a
continuing course of the same type of nonspecific, indistinguishable conduct
over a long time period, the issue is typically whether the jury believes the
complainant generally or not at all.  The
State informed appellant twelve days before trial of its intent to introduce
the following as extraneous offenses:

That the Defendant committed the offense of
Indecency with a Child and Sexual Assault of a Child, felonies, in Denton
County, City of Flower Mound, Texas, and in the City of Argyle, Texas, offense
date on or about May 1, 2002 to May 1, 2006.  The victim of the offense was
[Christine].  The defendant contacted her
breasts, vagina, and anus with his hands, mouth, and penis.  The defendant also had her . . . contact his
penis with her mouth and hands.  These
offenses occurred continually during that period.  The defendant also continually complemented
[Christine] on her physical appearance. 
He also continually discussed matters of a sexual nature with her.

 

Although
Christine testified to incidents occurring in Brownfield, Flower Mound, and
ArgyleCsome
of which must have occurred after she turned seventeenCat
least by the time of the State=s
election, appellant=s counsel knew that the
State was proceeding only on those incidents occurring in Denton County after
she had turned fourteen but before she had turned seventeen.  State=s
Exhibit 13, which was admitted during Christine=s
testimony, is a statement from Christine to Detective Shane Kizer
of the Denton Police Department indicating that appellant molested her between
800 and 1000 times over a six or seven year period, including when the family
lived in Brownfield, Flower Mound, and Argyle. 
Accordingly, we do not believe that there is any risk that appellant was
inadequately notified of the exact nature of the charges against him such that
he could not adequately defend himself.

Having
analyzed the four election-error factors set forth by the court of criminal
appeals in light of the entire record, we conclude and hold that the trial
court=s
failure to include an adequate limiting instruction did not harm appellant[13]
as to Count I and Counts III through VIII in the case involving offenses
against Christine (the breast touching, vaginal penetration, and
appellant-on-Christine oral sex offenses). 
See Dixon, 201 S.W.3d at 735B36.  We overrule appellant=s
second and third points complaining about those offenses.

2.  Count II (Appellant=s
Making Christine Give Him Oral Sex)

As
with the other seven offenses against Christine, an analysis of the first and
second factors weighs against harm as to the allegation regarding appellant=s
making Christine give him oral sex. 
However, because Christine testified to a specific incident of oral sex
in Argyle, and because William testified that he saw what appeared to be
appellant=s
attempting to force Christine to give him oral sex in Flower Mound, the
analysis of the unanimity and notice factors is of more concern as to this
offense than with the other offenses.

The
prosecutor did not limit the time frame when asking about the videotaped oral
sex incident in Argyle; instead, he asked Christine, AWas
there a time when you guys lived in Argyle that something happened where he
actually videotaped you?@  There is no evidence as to whether Christine
had already turned seventeen when this occurred.  So there is a risk that the jury could have
convicted for an offense occurring after Christine had already turned
seventeen.  Moreover, there is also a
risk that some of the jury members could have convicted for this offense based
on Christine=s
general testimony that appellant made her give him oral sex in Flower Mound,
her general testimony that appellant made her give him oral sex in Argyle, her
specific testimony regarding the videotaped incident in Argyle, or William=s
testimony regarding appellant=s
appearing to force Christine to his crotch area when she said she wanted a
dog.  Because the evidence regarding
appellant=s
making Christine give him oral sex included a mixture of specific and general
events, there is more of a risk that the jury could have convicted appellant
based on different events, and, thus, that the verdict was not unanimous.  Accordingly, we conclude and hold that
appellant was harmed as to Count II only. 
We sustain appellant=s
second and third points as to Count II only.

3.  Offenses Against
Rhonda

Rhonda
testified specifically that appellant had vaginal intercourse with her at least
twice in Flower Mound when she was under fourteen, and in seventh grade, and at
least twice when she was fourteen but not yet seventeen.  She testified more generally that it happened
a Alot
more than four@
times and that the same thing happened after the family moved to Argyle.

For
the same reasons set forth above regarding the offenses against Christine,
there is no danger that appellant was improperly subjected to the introduction
of extraneous sexual offenses against Rhonda, nor that the jury convicted
solely on the basis of the admission of those offenses.  As for the third and fourth factors,
unanimity and notice, we likewise perceive no risk of harm:  Rhonda=s
testimony was straightforward, general as to the commission of the offenses,
and clearly limited to the timeframe during which she was the ages alleged in
the indictment.  We conclude and hold
that appellant was not harmed as to Counts I through IV involving offenses
alleged against Rhonda.  See Dixon,
201 S.W.3d at 735B36.  We overrule his fifth and sixth points.

         IV.  Enhanced Punishment Range for Section
22.011(f) Convictions

In
his seventh and eighth points, appellant contends that the evidence was legally
and factually insufficient to convict him of violating section 22.011(f) as
alleged in Counts V through VIII involving Christine.  Alternatively, in his ninth and tenth points,
he claims his punishment under those counts is void because it exceeded that
allowed by law at the time he committed the offenses and, thus, is in violation
of the ex post facto protections of the Texas and United States Constitutions.

Section
22.011(f) provides that an offense under section 22.011(a) is a second degree
felony unless Athe
victim was a person whom the actor was prohibited from marrying or purporting
to marry or with whom the actor was prohibited from living under the appearance
of being married under section 25.01,@ the
bigamy statute; in the latter case, the offense is a first degree felony.  Tex. Penal Code Ann. '
22.011(f).  According to
appellant, subsection (f) Amust
be interpreted as requiring that the State prove a defendant was actually
committing >bigamy= as
described in 25.01 in order for it to obtain a conviction and allow subsequent
punishment as a first-degree felony.@

We
need not decide the scope of section 22.011(f) or the proof required by it
because it was not yet effective when appellant committed the offenses as
alleged and proved at trial.  Section
22.011(f) took effect September 1, 2005, after Christine had already turned
seventeen and therefore also after the commission of the offenses upon which
the convictions were based.  See Act
of May 29, 2005, 79th Leg., R.S., ch.
268, ''  4.02, 5.02, 2005 Tex. Gen. Laws 621,714,
720.  Thus, applying section 22.011(f) to
increase the punishment for the offenses in Counts V through VIIICwhich
the State alleged and proved were committed before Christine turned
seventeenCwould
be an impermissible ex post facto application of that section.  See U.S. Const. art.
I, ' 10; Tex.
Const. art. I, ' 16; Collins v.
Youngblood, 497 U.S. 37, 45B46
(1990), 110 S. Ct. 2715, 2720B21
(providing that a law that increases punishment after the commission of an
offense is an ex post facto law); Grimes v. State, 807 S.W.2d 582, 586 (Tex. Crim. App. 1991) (adopting federal ex
post facto analysis for Texas constitutional provision); Ponce v. State,
89 S.W.3d 110, 117B18
(Tex. App.CCorpus
Christi 2002, no pet.); see also Lindsey v. State, 672 S.W.2d 892, 894 (Tex. App.CDallas
1984, pet. ref=d).[14]  Accordingly, we conclude and hold that the
trial court erred by allowing Counts V through VIII to be enhanced to first
degree felonies under section 22.011(f). We sustain appellant=s
ninth and tenth points.[15]

Appellant
contends that we must reverse and acquit on these convictions because the
sentence is void.  But appellant did not
challenge the sufficiency of the evidence of the penetrations alleged in Counts
V through VIII, and section 22.011(f) does not define a new offense, only an
elevated range of punishment.  The
appropriate remedy for a sentence outside the range of punishment for an
offense is a remand for a new trial on punishment alone.  See Tex. Code Crim. Proc. Ann. art. 44.29(b) (Vernon
Supp. 2009); State v. Marroquin, 253 S.W.3d 783, 785 (Tex. App.CAmarillo
2007, no pet.); Fairrow v. State, 112 S.W.3d 288, 295 (Tex. App.CDallas
2003, no pet.).  Thus, we must remand
these four counts for a new trial on punishment.

                                                 V.  Continuance

In
his tenth and eleventh points, appellant argues that the trial court abused its
discretion by denying his written motion for continuance and by permitting the
introduction of extraneous offenses. 
Included in his eleventh point is a complaint that the State failed to
give him reasonable prior notice of its intent to introduce extraneous
offenses.  Appellant complains about two
extraneous offenses specifically: 
appellant=s assault of Christine and
her half-sister by ramming their car after he had chased them to LubbockCwhich
was admitted at guilt-innocenceCand
appellant=s
sexually assaulting one of his daughter=s
friends when the family lived in Brownfield.

Appellant
filed a written motion for continuance in cause number F-2008-01081-B only, the
case involving offenses against Rhonda. 
He argued that the State=s
providing notice of certain extraneous offenses, including the assault of his
daughter=s
friend, on October 1, 2008Ctwo
days before trial was scheduled to startCwas
unreasonable.  The State had provided
notice of the Lubbock assault on September 25, 2008; thus, appellant=s
motion for continuance did not apply to that extraneous offense.

Under
the Texas Code of Criminal Procedure, a criminal action may be continued on the
sworn, written motion of a defendant, so long as sufficient cause is fully set
forth in the motion.  Tex.
Code Crim. Proc. Ann. art. 29.03, 29.08 (Vernon 2006); Dotson v.
State, 146 S.W.3d 285, 297 (Tex. App.CFort Worth 2004, pet. ref=d).  Whether to deny a motion for continuance is
within the trial court=s discretion, and we will
not reverse its decision on appeal unless the appellant shows that the court
abused its discretion.  Janecka v. State, 937 S.W.2d
456, 468 (Tex. Crim. App. 1996), cert. denied, 522 U.S. 825 (1997); Dotson,
146 S.W.3d at 297. 
To establish an abuse of discretion, the defendant must show that he was
actually prejudiced by counsel=s
inadequate preparation time. Janecka, 937 S.W.2d at 468; Dotson,
146 S.W.3d at 297. 
Specific prejudice may include unfair surprise, an inability to
effectively cross‑examine the State=s
witnesses, or the inability to adduce crucial testimony that could have been
given by potential witnesses.  Janecka, 937 S.W.2d
at 468; Dotson, 146 S.W.3d at 297.  But a mere statement that counsel did not
have enough time to prepare an adequate defense does not demonstrate prejudice.
 Janecka,
937 S.W.2d at 468; Dotson,
146 S.W.3d at 297.

Here,
appellant contends that he was Aunable
to investigate this allegation and produce any evidence to contradict@ the
witness=s
testimony.  He also claims that the State
emphasized this evidence by calling him a serial molester during closing
argument at punishment.

Appellant=s
claim that he was unable to investigate and produce any evidence to contradict
the witness=s
testimony is general; it does not point to any specific prejudice and merely
posits that appellant did not have time to prepare an adequate defense.  The State told the trial court at a pretrial
hearing on October 6, 2008 that appellant was made aware of this incident via a
videotaped interview of Heather, which the State had allowed appellant access
to; the prosecutor also told the trial court,

I also know that the witnesses who are listed
in the 404(b) notice, prior to me filing it, when we made contact with them,
they had told us that an investigator was looking for them, that they had
gotten phone calls, that their friends and family had gotten phone calls, and
it was not our investigator.  So that
would logically lead us to believe that their investigator was seeking those
people and were actively looking for them before we filed the responses.

 

So it was actually in writing on those days
[October 1], but it=s my belief that the
defense knew of these people and had been actively searching for them prior to
the actual notice given.

 

The State did not mention
this witness in particular, but appellant acknowledged that Heather mentioned
the incident in her statement, which he had reviewed, and that he knew the
first name of the witness and that she was a friend of one of appellant=s
daughters (Christine and Rhonda=s
half-sister), but that he did not know of the witness=s
last name until October 1 when the State gave its notice.  The witness testified that the first time the
State had talked to her was October 1, 2008, the Wednesday of the week before
trial, which started Monday, October 6, 2008.  Punishment began on Thursday, October 9, 2008.

We
conclude and hold that the trial court did not abuse its discretion by denying
the continuance because appellant failed to show specific prejudice.  See Janecka,
937 S.W.2d at 468; Dotson,
146 S.W.3d at 297. 
Moreover, any error would have been harmless in light of the extensive
evidence regarding appellant=s
repeated, Aserial@
sexual abuse of his own daughters, which is far more inflammatory than the
single sexual assault testified to by the witness.  See Montgomery v. State, 810 S.W.2d 372, 397 (Tex. Crim. App. 1991) (op. on reh=g) (noting that sexual misconduct
against children is inflammatory in general). 
We overrule appellant=s
tenth point.

Appellant=s
eleventh point complains that he did not receive reasonable prior notice of the
State=s
intent to introduce evidence of the Lubbock assault at guilt-innocence.  He filed his request for the State to give
such prior notice in cause number F-2007B2107-BCthe
case involving offenses against ChristineConly.  Appellant did not object to the introduction
of evidence of this extraneous offense on the same grounds at trial.  Instead, he urged that the trial court should
first hold a hearing on the admissibility of the offense pursuant to a pretrial
motion in limine; he also objected on rule 403
grounds.  Accordingly, appellant has
failed to preserve this point for our review and we overrule it.  See Pena v. State, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009); Clarke v. State,
270 S.W.3d 573, 580B83
(Tex. Crim. App. 2008).

                                        VI.  Exclusion of
Testimony

In
his last two points, appellant complains about the trial court=s
exclusion of testimony.

We
review a trial court=s
evidentiary rulings for abuse of discretion. Weatherred v. State,
15 S.W.3d 540, 542 (Tex. Crim. App. 2000); Montgomery,
810 S.W.2d at 391.  A trial court abuses its discretion only when
the decision lies outside the zone of reasonable disagreement.  Green v. State, 934 S.W.2d 92, 101B02
(Tex. Crim. App. 1996), cert. denied, 520 U.S. 1200 (1997); Wenger v.
State, 292 S.W.3d 191, 202 (Tex. App.CFort Worth 2009, no pet.).

In
his twelfth point, appellant challenges the trial court=s
exclusion of testimony from a CPS investigator who observed Rhonda=s
interview at the Child Advocacy Center. 
Appellant made an offer of proof in which the CPS investigator testified
in response to questioning from appellant=s
counsel that she observed Rhonda=s
body language and answers to questions during the interview; after watching the
interview, in which Rhonda denied having been sexually abused by appellant, the
investigator ruled out sexual abuse and closed the case.  Appellant offered this testimony to rebut the
testimony of Detective KizerCwho
participated in the interviewCthat
in his opinion, based on Rhonda=s
body language and gestures during the interview, she was lying when she denied
that appellant had done anything to her.

When
the State cross-examined the CPS investigator, she admitted that if the child
does not make an outcry, then CPS has no reason to believe that sexual abuse
has occurred.  The State asked her the
following:

Q.      Fair
to say that you weren=t making any kind of
legal determination as to whether something happened or didn=t happen; simply
based on the victim saying it did not happen, you closed your case?

 

A.      Right,
because we had no evidence that anything had happened up until that point.

 

Later,
on redirect, she testified again as follows:

 

Q.      So
your determination wasn=t simply based upon
her denial?

 

A.      Well,
any time that a child does not make an outcry, unless there=s other people that
that child has made an outcry to that we get statements from and things like
that, then we have to rule a case out because the child didn=t say that anything
happened to him or her.

 

Q.      But
your recommendation as to this finding was based on watching the interview,
listening to the questions and the answers, watching her body language, talking
with Detective Kizer, and talking with Ms. Smith,
correct?

 

A.      Yes.

The
investigator never definitively answered whether she would have been able to keep
Rhonda=s
case open if she had determined that Rhonda was lying when she denied that
appellant had sexually abused her.  The
investigator merely stated that she had no evidence at that point on which to
keep a CPS case open.  Appellant wanted
to rebut Detective Kizer=s
testimony that Rhonda was not being truthful when she denied the sexual abuse
in the interview.  But as the court
stated regarding the investigator=s
testimony:  Awhat
she said was, when somebody says nothing happened to me and we don=t
have anybody else that she told something happened, then we don=t
have anything and we can=t do anything. . . .  We have no collateral sources that the girl
told anything differently to.@  Thus, the investigator=s
testimony did not directly contradict Detective Kizer=s
testimony.[16]  And as the trial court pointed out in
excluding the testimony, Rhonda had already testified before the jury and
admitted that she initially denied the sexual abuse but that she was lying when
she did so.  The jury was in a position
to see her testify in person and make a credibility determination at that
time.  See Tex.
Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Brown v. State,
270 S.W.3d 564, 568 (Tex. Crim. App. 2008), cert.
denied, 129 S. Ct. 2075 (2009). 
Accordingly, we conclude and hold that the trial court did not abuse its
discretion by excluding the evidence.  See
Tex. R. Evid. 401; Smith v. State, 65 S.W.3d 332, 340 (Tex. App.CWaco
2001, no pet.).  We overrule appellant=s
twelfth point.

In
his thirteenth point, appellant contends that the trial court improperly
refused to allow him to question Rhonda about her having been hospitalized for Acutting@
behavior when the family lived in Flower Mound and about appellant=s
having signed a waiver allowing her to speak freely with a psychologist about
why she was engaging in cutting.  The
trial court allowed appellant to make a bill, in which Rhonda testified that
when she was fourteen years old and in eighth grade, her basketball coach found
out she was cutting herself and told appellant and the school counselor.  Rhonda was hospitalized for about seven to
eight days and was treated by a psychologist for some time afterwards.  Rhonda agreed that appellant signed a Awaiver
so that [she] could have freedom of talking with [the psychologist] about why
[she was] cutting@ herself and that the waiver
said the psychologist Adid not have to disclose
anything that [Rhonda] told her.@

Appellant
argued to the trial court that this testimony was relevant because

part of the State=s case here is the
idea that my client had some type of ridiculous control of his family.  And if - - it is the argument of the defense
that if he did, he would never have agreed to sign a waiver not knowing what
his daughter was going to tell . . . the psychologist what the underlying basis
was for cutting herself.

 

Of course, I think at this point that the
investigator on the case believed it was because he believes that sexual abuse
was going on at the time, and this is the type of stuff that we know kids do
when they=re going through this
type of thing, other things too.  But,
again, I think it takes away an argument that I have showing my client=s lack of control of
the situation.  I think that is powerful
evidence that needs to be presented to this jury in our closing argument.

 

The State objected to the
admission of this testimony on relevance grounds and under rule 404.

Without
any evidence as to why Rhonda was cutting, this evidence is of only minimal
relevance and could only lead to speculation. 
Appellant could have been willing to sign the waiver for any number of
reasons:  because Rhonda was cutting for
reasons other than sexual abuseCwhich
does not bear upon the credibility of her testimony that such abuse did occur;
because Rhonda was so scared of appellant that he was confident she would deny
any sexual abuse to the psychologistCas
she initially did to the police, even in light of Christine=s allegations;
or for other reasons.  We conclude and
hold that the trial court did not abuse its discretion by excluding this
testimony, and we therefore overrule appellant=s
thirteenth point.  See Tex. R. Evid. 401; Woods v. State, 306 S.W.3d
905, 909B10
(Tex. App.CBeaumont
2010, no pet.).

                                                     Conclusion

Having
sustained appellant=s second and third points as
to Count II only in cause number F-2007-2107-B (the case involving offenses
against Christine), we reverse and remand the conviction and sentence for that
count for a new trial.  Having also
sustained appellant=s ninth point as to Counts V
through VIII in cause number F-2007-2107-B, we reverse the sentences for all of
those counts and remand for a new trial on punishment as to those counts
only.  Having overruled appellant=s
remaining points, we affirm the convictions and sentences as to Counts I, III,
and IV in cause number F-2007-2107-B and Counts I through IV in cause number
F-2008-1081-B (the case involving offenses against Rhonda).

 

 

 

TERRIE LIVINGSTON

CHIEF JUSTICE

 

PANEL:  LIVINGSTON, C.J.;
GARDNER and WALKER, JJ.

 

DO
NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED:  August 27, 2010











[1]In accordance with
the comment to rule of appellate procedure 9.8, we have used aliases to
identify the complainants and family members other than appellant.  See Tex. R. App. P. 9.8 cmt.





[2]We will discuss the
factual background of these cases in more detail in our analysis of appellant=s first six points.





[3]When the State elects
which of multiple acts it will rely on for conviction, a defendant is entitled
to an instruction charging the jury to consider only the elected act in
deciding guilt and limiting the jury=s consideration of all other unelected acts
to the purposes for which they were admitted. 
Duffey v. State, No.
05-08-00260-CR, 2009 WL 2596109, at *2B3 (Tex. App.CDallas Aug. 25, 2009,
no pet.); Rivera v. State, 233 S.W.3d 403, 406
(Tex. App.CWaco 2007, pet. ref=d).





[4]The State frames the
issue thusly:  AWhat is really at
issue in this case is not that the State failed to adequately elect the
offenses upon which it relied for conviction or that the charge failed to
adequately identify the offenses relied upon for conviction.  Instead, the issue is that the trial court=s instruction on
extraneous offenses alone was insufficient to serve as an adequate limiting
instruction.@





[5]Although all of these
counts alleged that Christine was under the age of seventeen, she turned
seventeen in June 2005, before all of the dates alleged in Counts IV through
VIII.  However, appellant did not
challenge any of the indictment=s allegations in the
trial court, so he did not preserve this issue. 
See Garcia v. State, 981 S.W.2d
683, 686 (Tex. Crim. App. 1998). 
Moreover, the purpose of alleging dates in the indictment is to show
that the statute of limitations has not yet run; the proof at trial is what
matters for determining whether an offense has occurred.  See id. at
685B86; see also id.
at 687 (Meyers, J., concurring).





[6]The family moved to
Brownfield when Christine was nine and lived there until a couple of days
before her fourteenth birthday in June 2002.





[7]Christine testified
that appellant used a condom most of the time.





[8]Although the house
was physically located in the city of Denton, it had a street address in
Argyle.  Both Argyle and Denton are
located in Denton County.





[9]Christine later
admitted in front of the jury that she lied about not dating Patrick.





[10]Christine has four
half-sisters, all of whom are appellant=s daughters.





[11]William also said
that appellant had told him that before he could have a girlfriend, appellant Awould have to try
[her] out.@





[12]She was born in 1990.





[13]Even if we were to
apply the constitutional harm standard applied in Duffey,
we would conclude and hold that the error was harmless beyond a reasonable
doubt as to those counts.  See
Tex. R. App. 44.2(a); Williams v. State, 273 S.W.3d
200, 225 (Tex. Crim. App. 2008).





[14]The State contends
that it also proved Christine=s lack of consent to
the penetrations in Counts V through VIII such that a conviction for sexual
assault based on nonconsensual sex occurring after Christine turned seventeen
would have been permissible; in other words, the State contends that it proved
that a section 22.011 offense for each count occurred at a time that the
elevated punishment range in section 22.011(f) was available.  See Tex. Penal Code Ann. ' 22.011(a)(1)(A).  But the
State cannot have it both ways; it elected to proceed on Counts V through VIII
for acts occurring before Christine turned seventeen.  Thus, the enhanced punishment range under
section 22.011(f) was not available for those counts.





[15]Because appellant=s ninth and tenth
points are dispositive, we need not address appellant=s seventh and eighth
points.  See Tex. R. App. P. 47.1;
State v. Iduarte, 232 S.W.3d
133, 140 (Tex. App.CFort Worth 2007), aff=d, 268 S.W.3d 544 (Tex. Crim. App. 2008).





[16]Additionally,
Detective Kizer participated directly in the
interview with Rhonda; the CPS investigator watched behind a two-way mirror.